UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| WILLIE TEASLEY, JR.  ) | CASE NO.  5:13CV1143 |
|   ) | |
| Plaintiff  ) | MAGISTRATE JUDGE |
|   ) | GEORGE J. LIMBERT |
| v.  ) | |
|   ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL  ) | |
| SECURITY ADMINISTRATION  ) | |
|   ) | |
|   ) | |
| Defendant.  ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Willie Teasley Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his January 26, 2012 decision in finding that Plaintiff was not disabled because he had the residual functional capacity (RFC) to perform a range of light and sedentary work-related activities (Tr. 7-20). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

**I.    PROCEDURAL HISTORY**

Plaintiff, Willie Teasley, Jr., filed his application for DIB and SSI on November 12, 2009, alleging he became disabled on June 6, 2006 (Tr. 115-124). Plaintiff's application was denied initially and on reconsideration (Tr. 76-81, 84-89). Plaintiff requested a hearing before an ALJ, and, on December 20, 2011, a hearing was held where Plaintiff appeared with counsel and testified

1

before an ALJ, along with Mark Anderson, a vocational expert (VE) (Tr. 26-68).

On January 26, 2012, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 7-25). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-5). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g).

## II.     STATEMENT OF FACTS

Plaintiff was born on January 7, 1963 (Tr. 159). He has a twelfth-grade education (Tr. 169). Plaintiff's past relevant work experience includes work as a laborer and cook (Tr. 165).

## III.    SUMMARY OF MEDICAL EVIDENCE

Afer noticing pain in the right low flank/abdominal region, Plaintiff underwent an EMG on August 15, 2006 (Tr. 316). The EMG showed a striking electrode decremental response in the deltoid muscle consistent with Myasthenia Gravis (Tr. 315). In addition, the study showed evidence of peripheral neuropathy (*Id.*). The autoimmune disease caused Plaintiff weakness and pain throughout his body. He was admitted to Aultman Hospital for generalized weakness on September 8, 2006 (Tr. 286). He reported that before presenting to the ER, he was having trouble walking, generalized weakness, and shortness of breath (*Id.*).

Plaintiff underwent a functional capacity evaluation on October 24, 2006 at the request of his treating physician, Latha Jayaraman, M.D. (Tr. 239). His largest complaint during testing was generalized upper and lower extremity weakness. Performance during the testing was limited by proximal upper and lower extremity weakness. His physical impairments caused physical therapist

2

Jason McDonald to opine that Plaintiff would require a vocational position that would limit his standing and ambulation time to less than twelve minutes at a time (Tr. 240).  Any lifting that Plaintiff would have to perform would have to be within outlined limits and performed below waist level and not away from his body.  In addition, he would need to be given frequent opportunities to rest after performing a physical task (*Id.*).

Plaintiff participated in physical therapy through Aultman Hospital.  At his initial evaluation on December 26, 2006, it was noted that Plaintiff had weakness holding his arms over his head and extending his arms out in front of him (Tr. 254).  He reported pain throughout his body, especially in his hips.  On examination, it was noted that five minutes of ambulation resulted in fatigue and moderate to severe body twitching (*Id.*).

On October 8, 2008, Plaintiff reported to Aultman Clinic, complaining of proximal limb weakness, especially in his arms.  It was very pronounced if he elevated his arms above shoulder level (Tr. 332).  After complaining of groin pain on multiple occasions, Plaintiff underwent surgery for a right inguinal hernia on November 20, 2008 (Tr. 276).  On a physical functional capacity evaluation dated December 10, 2008, one of Plaintiff's treating physicians, Dr. E. Ibrahim, noted that Plaintiff would exhibit weakness and fatigue in a work situation secondary to his diagnosis of Myasthenia Gravis.  In addition, he opined that Plaintiff could not lift any weight overhead, could not reach above shoulder level, and could only handle a low stress level in the work environment (Tr. 340).

Plaintiff presented to the Aultman Hospital Emergency Department on January 29, 2009 with complaints of left hip pain (Tr. 272).  It was noted that he had a history of a pelvic fracture (*Id.*).  At a follow up visit at Aultman Clinic on February 11, 2009, Plaintiff reported an uncomfortable pulling sensation in his left groin/left thigh (Tr. 330).  It was noted that his gait was unbalanced.  He

was favoring the left leg because of a straining sensation while walking (Tr. 331).

Plaintiff again presented to Aultman Clinic on September 1, 2009. His main complaint was chronic pain in the left hip region. He reported that the pain radiated down his left thigh and affected his left knee. An x-ray of the left hip performed that day demonstrated mild joint space narrowing with mild subchondral sclerosis consistent with mild degenerative change (Tr. 265). An x-ray of the left knee showed mild narrowing of the medial joint compartment consistent with degenerative joint disease (Tr. 266). Plaintiff was seen in the Aultman Hospital ER on December 21, 2009 for an exacerbation of his myasthenia gravis (Tr. 360).

On a physical residual functional capacity assessment dated February 6, 2010, state reviewing physician Maria Congbalay, M.D. opined that Plaintiff can frequently lift and/or carry ten pounds and stand/walk/sit for about six hours in an eight-hour workday (Tr. 350).

An x-ray of Plaintiff's hips, performed at the Cleveland Clinic on April 16, 2010 revealed bilateral avascular necrosis of the femoral heads (Tr. 425). After a CT of Plaintiff's chest revealed an anterior mediastinal mass (Tr. 425), Plaintiff was evaluated by Dr. Sudish Murthy in Cleveland Clinic's Department of Thoracic and Cardiovascular Surgery on June 15, 2010 (Tr. 426). It was Dr. Murthy's impression that in the setting of myasthenia gravis, anterior mediastinal mass, it was most likely thyoma. Dr. Murthy recommended operative intervention with myasthenia by way of resection of the mediastinal mass (*Id.*).

In April of 2010, Plaintiff began treating with a neurologist from the Cleveland Clinic Foundation, Dr. David Polston. On August 17, 2010, Dr. Polston reported worsening MG symptoms (Tr. 434). Plaintiff was experiencing worsening dysarthria to where he could only eat small meals intermittently because of exertional jaw weakness, eyelid ptosis on a daily basis, and worsening gait difficulties (Tr. 434). Plaintiff walked with an antalgic gait with his foot partially abducted due to

4

his severe hip disease (*Id.*).  On August 23, 2010, Plaintiff was admitted to the hospital for the urgent initiation of therapeutic plasmapheresis for his myasthenia (Tr. 438).  A few days later, on August 26, 2010, Plaintiff underwent a sternotomy, en bloc resection of mediastinal mass with attached wedge resection of the left upper lobe and innominate vein, reconstruction of innominate vein with prosthesis and thymectomy for MG (Tr. 449).

Plaintiff presented to the Cleveland Clinic for a post-operative followup on September 2, 2010 (Tr. 456).  It was noted that he tolerated the procedure well.  Examination revealed some weakness of arm abduction and leg flexion bilaterally (*Id.*).  Plaintiff subsequently decompensated and presented to the Cleveland Clinic Emergency Department on September 10, 2010 with worsening dysphagia.  He was admitted with facial weakness, chest pain, and difficulty swallowing.  He was discharged on September 15, 2010 (Tr. 473, 536).  Plaintiff underwent three plasma treatments while in the hospital (Tr. 536).

Plaintiff underwent a physical consultative examination at the request of DDS on September 9, 2010 (Tr. 400-407).  Plaintiff reported weakness and fatigue.  He also described a pulling sensation in the left leg, particularly when he stood or walked too long (Tr. 401).  After a physical examination, examiner Sushil Sethi, M.D. opined that Plaintiff's ability to do work-related activities, such as sitting, standing, walking, lifting, carrying, and handling objects, was limited to medium labor.  It was Dr. Sethi's opinion that Plaintiff would sit four to six hours and walk/stand one to two hours (Tr. 403).

On October 21, 2010, state reviewing physician, Dr. James Cole, affirmed the opinion of Dr. Congbalay (Tr. 410-411).

At an office visit on December 28, 2010, Dr. David W. Polston, Plaintiff's treating physician, reported worsening hip pain, with trouble standing and walking up stairs.  Dr. Polston noted that on

5

examination, Plaintiff's gait was impaired due to range of motion limitations related to bilateral necrosis of the hips (Tr. 416). Dr. Polston outlined Plaintiff's limitations in a Myasthenia Gravis Medical Source Statement dated December 28;, 2010 (Tr. 412-421).  The statement identified Plaintiff's symptoms as including fatigability of muscles after exercise, limb weakness, difficulty speaking, difficulty swallowing, diarrhea, and stomach cramping (Tr. 412). Dr. Polston stated that Plaintiff can walk no more than one city block without rest.  In addition, while engaging in standing/walking, Plaintiff needs a cane or other assistive device (Tr. 413). Dr. Polston opined that Plaintiff can only rarely carry ten pounds.  While Plaintiff can rarely twist, stoop, or crouch/squat, he can never climb ladders or stairs (Tr. 414).  In conclusion, it was Dr. Polston's opinion that Plaintiff is likely to be "off task because of his limitations twenty-five percent or more of the time" (*Id.*).

Plaintiff presented to Cleveland Clinic's Department of Radiation Oncology for an evaluation related to his diagnosis of malignant thymoma (Tr. 481). Plaintiff described having good days and bad days with his symptoms.  On the day of his evaluation, his swallowing had worsened (*Id.)*. Most of his pain was in his hips, which prevented him from sleeping well and finding a comfortable position (*Id.*). As of March 29, 2011, Plaintiff had completed a course of radiation (Tr. 544, 618). It was noted that Plaintiff experienced depressed mood throughout his treatment (*Id.*).

On June 10, 2011, Plaintiff presented to Cleveland Clinic's Department of Orthopedics (Tr. 550).  He complained of constant bilateral hip pain, despite undergoing physical therapy.  His symptoms included difficulty spreading his legs and extreme stiffness (*Id.*).  An x-ray of his hips performed the same day demonstrated avascular necrosis of the femoral heads with collapse, slightly increased on the right (Tr. 608).  Thus, on July 28, 2011, Plaintiff underwent a right total hip arthroplasty (Tr. 539). At his first post-op visit on September 9, 2011, Plaintiff was in pain and was

6

using a cane to ambulate (Tr. 575). He was actively participating in physical rehabilitation at another facility (*Id.*).

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work

experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## VI.  ANALYSIS

Plaintiff raises one issue:

- Whether the Administrative Law Judge's decision is supported by substantial evidence when he rejects the opinions of Plaintiff's treating physician.

8

Substantial evidence supports that the ALJ properly considered Dr. Polston's medical source statement which was rendered in December 2010, more than four years after Plaintiff's alleged disability onset (Tr. 412-15). The ALJ explained his reasons for giving Dr. Polston's assessment of significant limitations "little weight." 20 C.F.R. Sections 404.1527(d)(2) and 416.927(d)(2) (stating that the ALJ "will always give good reasons for the weight given a treating source's opinion"); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Specifically, the ALJ indicated that the assessment is internally inconsistent and inconsistent with Dr. Polston's own progress notes (Tr. 18, citing Exh. 16F). Substantial evidence supports the ALJ's reasoning. As the ALJ correctly concluded, Plaintiff underwent a total hip replacement, which resulted in a "normal postoperative examination of the right hip" by September 2011 (Tr. 18, *citing* Exhs. 19F, 21F). As the ALJ also noted, Plaintiff told his orthopedic surgeon at his pre-operative consultation, that his symptoms from myasthenia gravis "were under control" (Tr. 18, *citing* Exh. 20F). Plaintiff's report to his surgeon is consistent with Dr. Polston's assessment notation that symptoms were not problematic while on prescribed therapy (Tr. 412).

The ALJ also noted that on the same date that Dr. Polston assessed the significant restrictions, Dr. Polston indicated that Plaintiff was tolerating the plasma exchange treatments well and remained stable (Tr. 18, *citing* Exh. 16F). Dr. Polston defined "stable" by specifying that Plaintiff's strength and speech were normal (Tr. 18). At the time of Dr. Polston's office visit on that date, Plaintiff's occasional symptomatic flare-ups were attributed to having discontinued his medications in order to not have any GI symptoms while celebrating the holidays (Tr. 416). After Plaintiff's thymectomy and radiation, Dr. Polston noted in March 2011 that Plaintiff's condition was "essentially in remission at this point" (Tr. 545). Dr. Polston decreased Plaintiff's medication dosage (Tr. 546).

As indicated by the ALJ, there was little support for Dr. Polston's assessment (Tr. 18). Jason McDonald, a physical therapist who conducted a functional capacity evaluation at the request of L. Jayaraman, M.D., one of Plaintiff's treating physicians, indicated that testing supported that Plaintiff had the capacity for "light-to-heavy" work (Tr. 15, 18, *citing* Exhs. 1F, 2F). Mr. McDonald also assessed that with focus on strengthening, Plaintiff could possibly do greater than medium capacity (Tr. 240).

In addition, the ALJ considered that Magdy Ibrahim, M.D., who routinely saw Plaintiff at the Clinic and assisted him with financial programs, noted that Plaintiff had a diagnosis of myasthenia gravis "with normal neurological examination" (Tr. 15, *citing* Exh. 3F). Dr. Ibrahim opined that Plaintiff's thymectomy would likely lead to an eventual medication-free lifestyle (Tr. 333). He continued to advise against smoking and alcohol use, and, in December 2008, assessed that Plaintiff had the capacity to work full-time in a low-stress environment (Tr. 333, 340).

The ALJ also considered L. Moore PT's evaluation of Plaintiff's functional capacity, and found no signs of pain or distress (Tr. 16, *citing* Exh. 3F). Mr. Moore noted that Plaintiff had no difficulty with postural or overhead reaching up to thirty-five pounds (Tr. 16). Shortly thereafter, Selena Rjordan, NP, gave Plaintiff a work slip that restricted him to lifting up to twenty pounds for two weeks (Tr. 16, *citing* Exh. 2F). In addition, Chijioke Enweluzo, M.D. evaluated Plaintiff's hip pain (Tr. 262). Plaintiff reported no change in his activity level and no other symptoms (Tr. 262).

Thereafter, the ALJ considered the independent medical evaluation by Sushil M. Sethi, M.D. in 2010, as well as the evaluation of Plaintiff's thoracic specialist, Sudish Murthy, M.D. (Tr. 16-17, *citing* Exhs. 13F, 18-19F). Dr. Sethi indicated that Plaintiff carried a cane, but it was not necessary (Tr. 17). Dr. Sethi opined that Plaintiff's evaluation revealed that he could perform up to medium labor (Tr. 17). In addition, Dr. Murthy found Plaintiff neurologically grossly intact from a

neurocognitive and motor standpoint (Tr. 426). He advised Plaintiff that alcohol cessation was important preoperatively (Tr. 429).

Furthermore, Thomas Rice, M.D., Plaintiff's surgeon, advised that Plaintiff's thymectomy could possibly lead to great improvement with stability and no additional treatment needed (Tr. 456). As indicated by Dr. Polston's nurse, Dr. Rice confirmed that Plaintiff reported foregoing his medication until after his total hip replacement (Tr. 456).

Hence, substantial evidence supports the ALJ's conclusion that Plaintiff had the capacity for work. In regard to Plaintiff's symptoms from myasthenia gravis and a bilateral hip impairment, those symptoms are not long-lasting, nor disabling. They are temporarily attributed to short-term recovery periods and short-term discontinuation of medication.

The Court finds that the ALJ correctly gave greater weight to the assessment of Dr. Congbalay, who opined that the record supported Plaintiff's capacity for work at the light level of exertion (Tr. 18, *citing* Exh. 4F). Factoring in Plaintiff's hip replacement, the ALJ accommodated all credible symptoms by further reducing Plaintiff's capacity to jobs that permit a sit-at-will option, with occasional postural movements and no exposure to workplace hazards, which an individual such as Plaintiff can perform in a low-stress environment (Tr. 14, Finding No. 5).

In conclusion, substantial evidence supports the ALJ's finding that Plaintiff's impairments did not preclude a range of light and sedentary, unskilled work in accordance with regulations.

## **VII. CONCLUSION**

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional

capacity (RFC) to perform a range of light and sedentary work-related activities, and, therefore, was not disabled.  Hence, he is not entitled to DIB and SSI.


Dated: April 30, 2014                                             */s/George J. Limbert*
                                                                               GEORGE J. LIMBERT
                                                                               UNITED STATES MAGISTRATE JUDGE